December 1, 1952.

Record No. 3981.

Present, All the Justices.

The opinion states the case.

*James L. Warren* and *John B. Spiers,* for the appellant.

*J. L. Dillow* and *J. S. Andrews,* for the appellee.

SPRATLEY, J., delivered the opinion of the court.

In August, 1949, Ruby Katherine Williams filed her bill of complaint against her former husband, Earl B. Martin, in which she alleged that a deed dated May 14, 1940, purporting to have been executed by her, conveying certain real estate to Myrtle Blankenship was a ''forged instrument'' and without consideration; and ''that if her signature was ever placed on said deed it was procured by deceit, fraud, trickery or chicanery'' of Martin. She further alleged that on the same date, May 14, 1940, Myrtle Blankenship, sister of Earl B. Martin, and her husband, J. T. Blankenship executed a deed conveying the same property to Martin; and that both of the said deeds were executed and delivered at the instigation of Martin for the purpose of fraudulently divesting the complainant of the property and placing the legal title in his name. She prayed that both deeds be ''set aside and held for naught,'' and that Martin be required to exhibit to the court the original of the deed purporting to have been signed by her, so that it might be ascertained whether or not it was a ''forgery.'' Subsequently, by leave of court, the bill was amended and Myrtle Blankenship and her husband were admitted as parties defendant.

Myrtle Blankenship and J. T. Blankenship, her husband, answered the bill admitting that no consideration passed from them to the complainant for the land conveyed to them, nor for the conveyance of the land to Martin. They averred that they had no part in any of the illegal and fraudulent acts charged against Martin, and prayed that they be dismissed from the cause.

Earl B. Martin filed his answer denying all of the allegations of forgery and fraud charged against him. He averred that the property was purchased and owned by him, though the record title was originally taken in the name of his former wife, and that the subsequent transfer of the title to him was made with her full knowledge of the entire transaction and without

fraud or coercion on his part. He further averred that he was in possession of both of the original deeds and that he would make them available as part of the evidence in the cause. This he did.

On August 2, 1951, the trial court entered a decree holding that complainant was entitled to have the relief prayed for in her original and amended bill of complaint, and adjudicated that the two deeds of May 14, 1940, be set aside and held for naught, and the title to the property be reinvested in the complainant. However, the decree did not specify whether the deeds were set aside on the ground of forgery or for fraud.

There are three assignments of error; but they cover the same question, that is, whether the evidence was sufficient to sustain the allegations of the bill.

The evidence, in the form of depositions and exhibits filed therewith, may be summarized as follows:

The complainant and Earl B. Martin were married in 1929. They lived together as husband and wife until June, 1944. In June, 1944, they separated. Martin went to Arkansas and there secured a divorce on September 25, 1944. He remarried in November, 1945, and the complainant married her present husband in February 1949.

The property in controversy is a lot of land located in the Town of Narrows, Virginia. It was conveyed to Ruby Katherine Martin, the complainant, by two deeds from Sarah V. Johnston and her husband, dated respectively September 20, 1937, and May 24, 1938, both duly recorded in the Clerk's Office of the Circuit Court of Giles County, Virginia. A storeroom, with an apartment above, was built on the land. A mercantile business was conducted in the storeroom and complainant and defendant lived in the apartment above. The mercantile business was conducted as that of Ruby Katherine Martin, trading as E. B. Martin. Martin was the manager and had full and complete control over the business.

The complainant testified that Martin bought and paid for the land; that he paid for the construction of the building on the lot and bought the stock of goods and the store fixtures; that he operated the mercantile business and paid all bills; and that she thought they owned the business together.

The evidence is undisputed that in May, 1940, at the time of the conveyance in question, the complainant and defendant were

living in harmony without any domestic difficulties. In her testimony, the complainant testified most positively that she did not sign the deed to Myrtle Blankenship. She said, after being shown the original deed, that her signature upon it was a forgery. She further denied that she signed or acknowledged the deed before the notary public, who signed the certificate of acknowledgment, and claimed that she had no knowledge of its existence until defendant claimed the property in 1949. When asked why the land was bought in her name, her answer was: "Rightfully I cannot say; but someway it was something to do with the water hook-up at that time. * * * The only thing I know about it was he said that was the reason that he did not hold the property in his name." She denied that she made any agreement to subsequently convey the property to him.

Specifically, the complainant testified as follows:

"Q. Mrs. Williams, did you ever sell or deed this property to any person?

"A. I did not.

"Q. I hand you herewith an office copy of a deed, marked 'Exhibit No. 4,' dated May 14, 1940, which appears to be between Ruby Katherine Martin and Earl B. Martin, her husband, to Myrtle Blankenship, in which deed Ruby Katherine Martin and E. B. Martin transfer and sell the two lots conveyed to you by Mrs. Sarah V. Johnson for five dollars and other consideration. This deed is of record in the Clerk's Office of the Circuit Court of Giles County, Virginia, in Deed Book No. 58, at page 333; will you please examine this deed and state if you ever executed such deed?

"A. I did not.

"Q. Did you ever receive any money or anything from Myrtle Blankenship for this property?

"A. I did not.

"Q. And you know you never conveyed the property to Mr. Blankenship?

"A. I did not."

\* \* \*

On cross-examination this took place:

"Q. Do you deny that you signed this deed to Myrtle Blankenship?

"A. I did not sign any deed.

"Q. I am going to show you here the original deed that was

signed by you and Mr. Martin to Myrtle Blankenship, and I am going to tell you the circumstances in which that deed was signed, and ask you if you do not remember it. You first look at the deed—is that your signature on that deed?

"A. It is not.

"Q. Your statement is that you did not sign that deed?

"A. I did not sign it.

"Q. That signature that appears there is not your signature?

"A. It is my name, but not my signature."

Upon being recalled to the stand in rebuttal, she made the following statements:

"Q. Examine it (the deed) closely. The name of Ruby Katherine Martin is written there, do you see the name of Earl B. Martin right under it. Is that your signature?

"A. No sir, it is not; it looks like it was forged.

"Q. Do you have any papers, checks or other writings of around 1940, that you could examine that might have your signature upon them?

"A. I may have.

"Q. Would you deliver to the Court some document which you might have signed in 1940?

"A. If I can find them, I will.

"Q. This deed has been in the files of this Court for a number of months, have you ever made any effort to have the signature examined.

"A. I have not.

"Q. Were you living with Mr. Martin in 1940, and continued to live with him until 1944?

"A. That is correct, up until 1943; he left in June, 1943.

"Q. You all had never had any trouble up to 1943, or anything, had you?

"A. Not that I recall, exactly.

"Q. You got along in the usual way as husbands and wives do?

"A. As far as I know; he had not left any, and we got along all right."

After the complainant and defendant separated in June, 1944, Mrs. Williams continued to live in the apartment above the store. By contract and lease dated July, 1944, signed by her and Martin, the storeroom was rented to S. H. Roark for one year from August 1, 1944, with the right to renew the same for

the further period of four years at $100 per month, payable to complainant. In addition, the merchandise in the premises was sold to Roark for about $5200 and the amount paid to the complainant. She also collected the outstanding store accounts and the funds on deposit in bank.

Earl B. Martin testified that he purchased the land and had the title placed in the name of his wife because he was interested or involved in a controversy with the Town of Narrows in a suit about the town furnishing water to landowners or tenants, and that the town would not enter into a contract to supply water for the property if the title was in his name. He, therefore, directed that the conveyance be made to his wife with the understanding that she was to reconvey it to him whenever requested. He stated that he had his attorney prepare the two deeds in question, and having informed the complainant that the deed would be brought to her for her signature, he requested Julian L. Webb, a notary public, to accompany him to his home for that purpose; that he and Webb went to his apartment and there he and complainant signed and acknowledged the deed to Mrs. Blankenship in the presence of Webb; that complainant made no objection to executing the deed in compliance with the agreement had with her when the lot was placed in her name; that he, Webb, J. L. Warren, his attorney, and J. T. Blankenship, who was waiting downstairs, then went to Blankenship's home. There he and Webb went in the home and he handed Blankenship both deeds, and both of the Blankenships signed and acknowledged before Webb the deed to him, and that he recorded both deeds the following day in the Clerk's Office of Giles County.

Martin further stated that after he and his wife separated in June, he signed the contract with Roark for the lease of the premises and sale of the merchandise in a settlement with his wife for her support and that of their two children; that he never received any part of the rent thereafter, nor any of the proceeds from the sale of the goods, from the collection of the accounts, nor from the bank deposits; and, that, in addition, he had paid complainant $50 per month for the further support of their children.

He said that the business part of the premises was vacated by its tenant in July, 1949, and the storeroom closed; that the complainant and her present husband continued to occupy the

apartment above the storeroom; that he had been refused the key to the storeroom and possession of the premises; and that on August 1, 1949, he notified Mrs. Williams that until possession was delivered to him, she would be expected to pay the sum of $100 per month rent for the storeroom and $40 for the apartment, beginning from that date.

He explained that he had the two deeds of May 14, 1940, prepared and executed in the manner stated, because of the advice of a West Virginia attorney that the title should be transferred to him in that way.

The original deed from the Martins to Myrtle Blankenship shows, insofar as is material here, the following:

"* * * Witness the following signatures and seals:

/s/ RUBY KATHERINE MARTIN   (Seal)
/s/ EARL B. MARTIN   (Seal)

State of Virginia

County of Giles, to-wit:

I, Julian L. Webb, a Notary Public in and for the County and State aforesaid, do hereby certify that Ruby Katherine Martin and Earl B. Martin, her husband, whose names are signed to the foregoing writing, bearing date on the 14th day of May, 1940, have each this day personally appeared before me and acknowledged the same.

My commission expires on the 3rd day of April, 1944.

Given under my hand this 14th day of May, 1940.

(Seal)                         /s/ JULIAN L. WEBB
                                    Notary Public."

Julian L. Webb, a duly commissioned and qualified notary public, testified that he clearly recalled the transactions of May 14, 1940, and the circumstances leading up to them. He said that Mr. James L. Warren, attorney for Martin, asked him to take an acknowledgment as a notary public; that the defendant, Martin, came to the office where he was employed as a bookkeeper, and together they went to the Martin store, thence upstairs to the living room in the apartment above, where they met the complainant, Martin's wife; that Martin said to his wife, who appeared to be "very friendly,"—"Here is the deed for you to sign;" that without any objection whatever, she and Martin signed their names to the instrument and each of

them acknowledged the same before him; and that he then and there executed the certificate of acknowledgment shown on the deed. After this was done, he went to the home of the Blankenships and in the living room of the latter's home, both Mr. and Mrs. Blankenship affixed their signatures to the deed conveying the property to Martin, and acknowledged the same, without any question being asked, and that he then prepared and signed the certificate of acknowledgment thereto. He did not recall reading the deed to either Mrs. Martin or the Blankenships and did not discuss it with either of them.

J. T. Blankenship admitted his signature to the deed to Martin and said he remembered the occasion; but that he did not then or thereafter read the deed. He testified that Martin had previously told him that he wanted the property out of his wife's name as he intended to separate from her and desired the property himself, and he made the arrangements for his wife to sign the second deed to complete the transaction. He requested Webb, the notary, to come and witness the signatures of himself and wife, and that he and Webb were accompanied to his home by Mr. J. L. Warren.

Mrs. Blankenship said she didn't know anything about the matter until the deed was brought to her to sign, and from what was then said she thought she was "signing it" to herself. She remembered that Martin and his attorney, Warren, accompanied Webb to her home.

There is some evidence attacking the veracity of the defendant; but none to contradict the evidence of Webb, the notary public, except a statement by a witness that Webb had told him, at one time, he did not remember the transaction. This Webb denied.

In the lease and contract of sale between the complainant and her husband to S. H. Roark, dated July 13, 1944, the original of which is an exhibit with the evidence, the signature "Ruby Catherine Martin" is strikingly similar to the signature "Ruby Katherine Martin," which appears on the deed of May 14, 1940, to Mrs. Blankenship. The difference in the spelling of the middle name is apparently due to the fact that in the caption of the typewritten lease and contract complainant's name is stated as "Ruby Catherine Martin."

The principles of law applicable are not in dispute. The sufficiency of the evidence to support the adjudication of the

trial court is the only real question. The allegations of the bill, that the complainant's signature was forged, and that if she signed the deed her signature was procured by fraud, are inconsistent. Her testimony is consistent only with the charge of forgery. In it she made no claim that defendant fraudulently and deceitfully induced her to join in the deed. It is manifest that she staked her case on the contention that she never saw or signed the deed of May 14, 1940, to Mrs. Blankenship. Her denials of the signature were repeated and positive. She denied signing it when a copy was exhibited. She continued her denial after the evidence of Julian L. Webb, the notary public, had been introduced and after the original deed was shown to her. So far as the record shows, she made no effort to support her denial.

In *McCauley* v. *Grim*, 115 Va. 610, 612, 79 S. E. 1041, this is said: "It is settled law in this State that taking and certifying acknowledgments to a deed is a judicial act, and, therefore, the certifying officer's determination of the matters involved has the conclusive force and effect of a judgment and imports absolute verity, and cannot be collaterally attacked.

" 'It cannot * * * be impeached, even directly, save in a court of equity, and not then except for fraud.' 2 Minor on Real Property, § 1398."

This statement is approved in *New* v. *H. E. Harman Coal Corp.*, 181 Va. 627, 634, 26 S. E. (2d) 39, and in that case on page 634, we further said: "Forgery is a felony. Its commission will not be presumed. Every presumption is in favor of innocence and not of guilt. When relied upon for the cancellation of an instrument, it must be proved by clear and satisfactory evidence—evidence that is positive, cogent and convincing." (Cases cited.)

Added to the weight we must give to the certificate of the notary public, that the signature of each of the grantors was personally acknowledged before him, is the evidence of the notary public and that of Mr. and Mrs. Blankenship with reference to the circumstances surrounding the execution of the two deeds of May 14, 1940.

The rule is firmly established that fraud, when relied upon, must be expressly charged and must be proven by evidence that is clear, cogent and convincing. The burden is upon the one alleging it, and if it is not strictly and clearly proven as alleged, by circumstantial or direct evidence, no relief will be

granted. *Union Trust Corp.* v. *Fugate,* 172 Va. 82, 89, 200 S. E. 624; *Hickman* v. *Trout,* 83 Va. 478, 490, 3 S. E. 131; *Redwood* v. *Rogers,* 105 Va. 155, 158, 53 S. E. 6; *McClintock* v. *Royall,* 173 Va. 408, 415, 4 S. E. (2d) 369; *Jacobs* v. *Jacobs,* 184 Va. 281, 285, 35 S. E. (2d) 119.

■ ■ Upon a fair consideration of all the evidence, it is clear that it falls far short of proving that the deed from complainant to Mrs Blankenship was a forgery. It also fails to establish by clear, cogent and convincing evidence that her signature thereto was procured by fraud and deceit. Complainant's denial of her signature is a negation of any act or acts in the procurement of it. She lived with defendant in harmony for more than four years after the date of the deeds, and it may be that she failed to remember the transaction; but neither her failure to remember nor the impression that she was unfairly treated is sufficient to establish fraud and deceit.

If complainant testified truthfully, the fraud perpetrated upon her was not in procuring her signature but in the forgery of her name, as charged in one allegation of the bill, and she has failed to clearly prove a forgery. Her allegation, ''that if her signature was ever placed on said deed it was procured by deceit, fraud, trickery and chicanery'' is a supposition, providing the basis for a conclusion not supported by her evidence.

Complainant cannot ask that her case be made stronger than she has made it, where as here, it depends upon facts which should have been within her own knowledge and as to which she testified. She cannot ask us to believe her testimony that she did not sign the deed and to hold that she did sign it by reason of the fraud and deceit of the defendant, when her own testimony fails to show that any fraudulent inducement was held out to obtain her signature. *Massie* v. *Firmstone,* 134 Va. 450, 462, 114 S. E. 652; *Bassett & Co.* v. *Wood,* 146 Va. 654, 661, 132 S. E. 700.

For the foregoing reasons we are of opinion that the decree of the trial court is without sufficient evidence to support it. Therefore, it will be reversed and set aside and a decree here entered dismissing the bill of the complainant.

*Reversed and final decree.*